## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

SCOTTY SANTOS DIAZ,

      Plaintiff,

vs.

SGT. INEZ MARTIN, TARAMA MOISE,
SAMANTHA MOONSAMMY,
KIMBERLY MERCEDES,

      Defendants.

Case No.: 1:20-cv-23889-BB

## NURSE DEFENDANTS' MOTION TO EXCLUDE TESTIMONY
## OF PLAINTIFF'S EXPERT DR. RICHARD PARRISH

Defendants Tarama Moise, Samantha Moonsammy, and Kimberly Mercedes (collectively, the "Nurse Defendants") move to exclude the opinions of Plaintiff Scotty Santos Diaz's expert Dr. Richard Parrish pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because they are unreliable and unhelpful.

## INTRODUCTION

Mr. Diaz, a prisoner incarcerated in the custody of the Florida Department of Corrections ("FDC"), sued the Nurse Defendants for allegedly being deliberately indifferent to his medical needs after he was sprayed with pepper spray for disobeying a corrections officer's commands. Mr. Diaz retained Dr. Parrish to opine on whether the Nurse Defendants violated the standard of care in their treatment of Mr. Diaz. Dr. Parrish's opinions should be excluded for two reasons.

*First*, Dr. Parrish's testimony is unreliable because Dr. Parrish based his standard of care opinions on incomplete information and incorrect assumptions. He admitted (1) he did not know whether the Nurse Defendants or FDC employees were responsible for irrigating Mr. Diaz's eyes

following the use of chemical agents, (2) he did not know how FDC's policies and procedures work, and (3) he had not been provided all the medical records detailing the care provided by the Nurse Defendants. These deficiencies resulted in Dr. Parrish changing his opinion at his deposition to blame Mr. Diaz's alleged injuries on an "institutional failure" instead of the failure of the Nurse Defendants. And, tellingly, it has resulted in Mr. Diaz stating his intent to dismiss the claim against Nurse Mercedes after Dr. Parrish admitted her treatment satisfied the standard of care.

*Second*, Dr. Parrish's opinions are not helpful to the jury because they contain impermissible legal conclusions at the prompting of Mr. Diaz's counsel. Dr. Parrish repeatedly opined that the Nurse Defendants and others were indifferent to Mr. Diaz's medical needs, which Dr. Parrish testified was a term with no medical significance included at the suggestion of Mr. Diaz's counsel. This attempt to have Dr. Parrish invade the province of the jury and serve as a mouthpiece for Mr. Diaz's counsel is wrong, and Mr. Diaz's counsel's legal conclusions masquerading as Dr. Parrish's opinion should be excluded.

## BACKGROUND

Mr. Diaz is an incarcerated prisoner who has glaucoma. Prior to his transfer to Dade C.I. in November 2018, Mr. Diaz lost sight in his right eye, but he claimed he continued experiencing pain caused by elevated intraocular pressure (IOP) caused by the glaucoma.

**A. The use-of-force incident and subsequent treatment.**

On May 1, 2020, Mr. Diaz was sprayed with oleoresin capsicum, commonly called OC, a form of pepper spray. After he was sprayed, corrections officers took Mr. Diaz to a shower cell where he was instructed to decontaminate. After his decontamination shower, he was taken to medical for a post-use-of-force examination by Nurse Moise, which occurred roughly 30 minutes after he had been sprayed with the OC. Exhibit A, Medical Records, at 1–2.

The next day, Mr. Diaz submitted a sick call request. *Id.* at 3. Mr. Diaz was seen by Nurse A. Kennedy for the sick call request on May 6, 2020. *Id.* at 4.

Mr. Diaz claims to have submitted another sick call request directly to Nurse Moonsammy on May 14, 2020, but there is no record of this sick call request. ECF No. 68 at ¶ 40.

On May 27, 2020, Mr. Diaz submitted another sick call request. Ex. A at 5. Nurse Mercedes saw Mr. Diaz in sick call for this request on June 4, 2020. *Id.* at 5–8. Nurse Mercedes referred Mr. Diaz to the clinician, who saw him the same day. *Id.* Based on this encounter, physician's assistant S. Altamirano requested a consult for Mr. Diaz to be seen by an optometrist on June 4, 2020, and prescribed Mr. Diaz pain medication and an antibiotic for his eye. *Id.* at 8–10.

On June 17, 2020, Mr. Diaz submitted another sick call request. *Id.* at 11. It was triaged by Nurse Moonsammy as urgent, and Mr. Diaz was seen by Nurse Mercedes on June 23, 2020. *Id.* Nurse Mercedes again referred Mr. Diaz to a clinician for additional treatment. *Id.* at 40–43.

Mr. Diaz submitted another sick call request on July 3, 2020. *Id.* at 17. Nurse Mercedes saw Mr. Diaz on July 6, 2020, at which point she again referred Mr. Diaz to a clinician. *Id.* at 17–21. Mr. Diaz was then seen on July 16, 2020, by P.A. Altamirano. *Id.* at 22–23.

Mr. Diaz submitted another sick call request on July 22, 2020. *Id.* at 24. Nurse Mercedes saw Mr. Diaz on July 24, 2020. *Id*. Nurse Mercedes referred Mr. Diaz to a clinician. *Id.* at 25–28.

Mr. Diaz was then taken to Bascom Palmer Eye Institute on August 5, 2020. *Id.* at 29–36.

**B.  Dr. Parrish's opinions and testimony.**

Mr. Diaz retained Dr. Parrish as a standard of care expert, and Dr. Parrish provided a Rule 26(a)(2) Report. *See* Dr. Parrish's Report, attached as Exhibit B.[1] In his report, Dr. Parrish opined

---

[1] The page numbers in Dr. Parrish's report are misnumbered, with the second page listed as page "1." The pinpoint citations to the report will refer to the CM/ECF page number assigned to the exhibit for clarity of record.

that the Nurse Defendants violated the standard of care and were indifferent to Mr. Diaz, but his deposition testimony demonstrates that his opinions are unreliable.

First, in the Summary of Opinions section of his report, Dr. Parrish repeatedly opines on the failures of "Defendants" when treating Mr. Diaz. *Id.* at 3–4. For instance, he opines that (1) Defendants failed to ensure proper ocular irrigation, (2) Defendants failed to adhere to the minimum standard of care, (3) Defendants failed to ensure Mr. Diaz was treated by a medical professional, etc. *Id.* at 4.

But at deposition, Dr. Parrish testified that the term "Defendants" did not actually means Defendants. Deposition of Dr. Parrish, attached as Exhibit C, at 107–110. Instead, he clarified,

> In my use of the word "Defendant", it is really the institution[al] failure -- not being but identify who's responsible in providing that care -- but, in a sense, if it's a -- it's a shared responsibility throughout the institution or the enterprise for failure to provide the proper irrigation. Who specifically is responsible for that would be defined by the protocol in the FDOC.

*Id.* at 109:3–9. When asked whether he knew who that responsible person or persons would be, Dr. Parrish testified, "No, I don't." *Id.* at 109:10–16. This applies to the entirety of the Dr. Parrish's opinions in his Summary of Opinions section of his report. *Id.* at 109:22–25 to 110:1–7. **So none of the opinions in the Summary of Opinions section of Dr. Parrish's report pertain to the Nurse Defendants or any other Defendants who were dismissed from this action.**

Second, and relatedly, Dr. Parrish testified he was not familiar with FDC's policies and procedures, had never worked in a correctional setting, and had never treated patients in a correctional setting. *Id.* at 104:22–25 to 105:1–22; 133:20–25 to 134:1–4 (testifying he did not know procedures for how sick calls were submitted by inmates). Dr. Parrish stated he did not know who was responsible for decontamination of an inmate following the use of chemical agents, or even what methods of decontamination were available at Dade Correctional Institution, the facility where Mr. Diaz was housed. *Id.* at 108:21–25 to 109:1–16 (testifying he did not know who was

4

responsible for performing ocular irrigation on Mr. Diaz); 121:5–11 (testifying he did not know what equipment Dade C.I. had for ocular irrigation and had not requested such information); and 129:15–24 (testifying "it's not clear it was [Nurse Moise's] responsibility" to provide ocular irrigation for Mr. Diaz because "[s]he saw him after he was placed in a shower.").

Third, it became apparent at his deposition that Dr. Parrish had not been provided a complete copy of Mr. Diaz's medical records from May through August 2020, even though Dr. Parrish testified having the complete records was necessary for him to render a standard-of-care opinion. *Id.* at 107:1–13. Specifically, he stated:

> Q: Do you know if you received the complete copy of Mr. Diaz's medical records?
>
> A: The answer is: I don't know. But I have no reason to believe that part of it was excerpted from me.
>
> Q: If there were additional medical records regarding Mr. Diaz's treatment for his eyes, would that be something that would be important for you to review?
>
> A: Of course, yes.
>
> Q: And when you are rendering an opinion, like you are in this case, about whether there's been a deviation from the standard of care, is it important for you to review the treating providers' medical records?
>
> A: Yes.

*Id.* That Dr. Parrish did not have the complete medical records—and the importance of those missing medical records to his opinions—is clear, as discussed below.

• Dr. Parrish opined that on May 2, 2020, Mr. Diaz submitted a sick call request, was seen by Nurse A. Kennedy, but that she did not provide medication. Ex. B at 9, ¶ 7. When testifying about the May 2 sick call request, Dr. Parrish admitted he had not reviewed the medical records of the treatment following that sick call, stating he was "unaware" of such records. Ex. C at 135:1–8. Dr. Parrish testified if there was an intervening record, it would affect his opinion. *Id.* at 135:9–13. **The intervening medical record <u>not</u> provided to Dr. Parrish shows Mr. Diaz was seen by Nurse A. Kennedy, who gave Mr. Diaz ibuprofen and placed an eye drop refill.** Ex. A at 4.

- Dr. Parrish opined Nurse Mercedes saw Mr. Diaz on May 27, 2020—a conclusion he later admitted was not corroborated—and opined Nurse Mercedes did nothing to treat Mr. Diaz, which fell below the standard of care and constituted cruel indifference. Ex B. at 10, ¶¶ 13–14.[2]  After clarifying that Nurse Mercedes saw Mr. Diaz for the first time on June 4, 2020, Dr. Parrish was asked whether he had seen any medical records from June 4, 2020, other than a Chronological Record of Health Care, and he testified he had not. Ex. C at 149:25 to 152:1–4. He further testified if there were medical records indicating Nurse Mercedes had referred Mr. Diaz to a clinician on June 4, 2020, it would affect his opinion and he would have concluded she satisfied the standard of care. *Id.* **The medical records <u>not</u> provided to Dr. Parrish show Nurse Mercedes referred Mr. Diaz to a clinician on June 4, 2020.** Ex. A at 6–7.

- Dr. Parrish opined that Mr. Diaz submitted another sick call request on June 17, 2020, but received no response. Ex. B at 11, ¶ 18. He then opined that Nurse Mercedes saw Mr. Diaz on June 23, 2020,[3] but "gave him no medication, nor did she take him to see P.A. Altamirano, or any other physician." *Id.* at 11, ¶ 19. At his deposition, Dr. Parrish testified he had not seen any medical records from the June 23, 2020 appointment with Nurse Mercedes. Ex. C at 153:25 to 155:1–23. He testified, though, that if such records existed, they would have affected his opinion. *Id.* **The June 23, 2020 medical records <u>not</u> provided to Dr. Parrish show Nurse Mercedes referred Mr. Diaz to a clinician for additional examination and treatment.** Ex A. at 12–15.

---

[2] The assumptions made by Dr. Parrish about how sick calls work, which he attributes to information he received from Mr. Diaz's counsel, has been shown to be demonstrably false, and he repeatedly was forced <u>to</u> concede he could not corroborate the assumptions he made about when different nurses saw Mr. Diaz. This is addressed *infra* in Section A.2.

[3] Dr. Parrish's report actually states June 24, 2020, but that appears to be a scrivener's error.

- Dr. Parrish also opined that Mr. Diaz submitted a sick call request on July 3, 2020, but received no response. Ex. B at 11, ¶ 20. At his deposition, Dr. Parrish was asked if he would be surprised to learn Mr. Diaz had been seen on July 6, 2020, to which he replied that he would be surprised and would have wanted to review those records before rendering his opinions. Ex. C at 159:9–15. **The July 6 medical records <u>not</u> provided to Dr. Parrish show Mr. Diaz was seen by Nurse Mercedes, who referred Mr. Diaz to a clinician for "pain in eye."** Ex. A at 18–21.

As these multiple examples show, Dr. Parrish was not provided complete medical records by Mr. Diaz despite Dr. Parrish's testimony that he needed all the records to form an opinion.

Fourth, Dr. Parrish uses variations of the phrase deliberate indifference to characterize the actions of the Nurse Defendants and others. Ex. B at 4, ¶¶ 5, 9, 13; 9, ¶ 5; 10, ¶ 14. When asked about his use of the term during his deposition, Dr. Parrish stated he was unaware of the legal import of the term, which had been suggested to him by Mr. Diaz's counsel. Ex. C at 42:12–25 to 43:1–18; and 117:7–9. And he testified the term had no specific medical meaning. *Id.* at 69:24–25 to 70:1–14; and 116:5–16 ("I have no medical definition of 'indifference.'").

## <u>ARGUMENT</u>

Dr. Parrish's opinions should be excluded pursuant to Federal Rule of Evidence 702 and the standard set forth in *Daubert*, 509 U.S. 579. Rule 702 of the Federal Rules of Evidence provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" four conditions are met:

  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

  (b) the testimony is based on sufficient facts or data;

  (c) the testimony is the product of reliable principles and methods; and

  (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts must act as "gatekeepers" under Rule 702, admitting expert testimony only if it is both reliable and relevant, *McDowell v. Brown*, 392 F.3d 1283, 129 (11th Cir. 2004), and ensuring that "speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'," *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation marks omitted).

To fulfill their gatekeeping obligations, district courts must undertake a "rigorous inquiry" into the expert and his proposed testimony to ensure that "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink*, 400 F.3d at 1291-92 (internal quotation omitted). Put differently, "the expert testimony must be reliable, so that it must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions." *McDowell*, 392 F.3d at 1298. The expert's opinions must also be "relevant," meaning that the testimony must have a "justified scientific relationship to the pertinent facts" so that it will assist—rather than mislead—the trier of facts. *Id.* at 1298-99.

The proponent of the expert testimony bears the burden of satisfying these *Daubert* and Rule 702 requirements. *Rink*, 400 F.3d at 1292.

Here, the Court should strike Dr. Parrish's opinions because they are unreliable and they will not assist the trier of fact. *First*, Dr. Parrish's opinions are unreliable because they are based on insufficient information and unwarranted assumptions about a process Dr. Parrish admitted he did not understand. And, based on his own testimony, Dr. Parrish's methodology cannot be

deemed reliable given that he was purposefully not provided with complete medical records, which he testified he needed to review to render an opinion. Second, Dr. Parrish's opinions that the Nurse Defendants exhibited "indifference" to Mr. Diaz's medical needs is an improper legal conclusion he is not permitted to offer.

## A. Dr. Parrish's opinions are unreliable.

Dr. Parrish's opinions are not reliable for two reasons. First, the opinions are not based on sufficient data, rendering the methodology unsound and unreliable. Second, the opinions are premised on faulty assumptions about FDC policies and procedures about which Dr. Parrish testified he was unfamiliar. Because Dr. Parrish's assumptions are unsupported, his opinions are tainted and should be excluded as unreliable.

### 1. Dr. Parrish's opinions are not based on sufficient data or sound methodology.

The Court should exclude Dr. Parrish's standard of care opinions because they are not based on sufficient data, rendering Dr Parrish's methodology unreliable. An expert's report must be the product of "reliable principles and methods" and must be based on "sufficient data" that is relevant to the case and opinions offered. *Rink*, 400 F.3d at 1293–94. Expert opinions must be "grounded in the methods and procedures of science," they "must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions," and they must have a "justified scientific relationship to the pertinent facts" in the case. *McDowell*, 392 F.3d at 1298-99. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).

Dr. Parrish's opinions do not meet the standard for reliability. As explained above, Dr. Parrish's opinions are based on an incomplete set of data. For reasons unknown, Mr. Diaz's

counsel withheld medical records from Dr. Parrish. These are records Dr. Parrish repeatedly testified he would need to see to render a reliable standard of care opinion. Ex. C at 107:1–13; 135:9–13; 149:25 to 152:1–4; 153:25 to 155:1–23; and 159:9–15. That he did not review these medical records he admits he needed to review is reason enough to exclude his unreliable opinion.

The case law supports this contention. While an expert may base an opinion solely on a review of medical records, the expert must take care to review all medical records necessary to render a reliable opinion. For example, in *Milbrath v. NCL (Bahamas) Ltd.*, No. 17-CV-22071, 2018 WL 2291307, at *2 (S.D. Fla. May 18, 2018), a court in this District concluded a defense expert "who reviewed *all of the plaintiff's medical records*, plaintiff's deposition testimony, a neuropsychological report, brain imaging results, and the reports of the plaintiff's expert" had provided a reliable opinion under *Daubert*. (emphasis added).

Courts do not permit opinion testimony when it is apparent that the expert has based his opinion on a selective or "cherry picked" set of records. *See 360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 6075566, at *1 (W.D. Tex. Apr. 22, 2016) ("Experts cannot ignore relevant evidence by cherry-picking the facts which conform to a desired outcome."); *see also Barber v. United Airlines, Inc.*, 17 Fed.Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion [the expert] cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'"); *see also Crowley v. Chait,* 322 F.Supp.2d 530 (D.N.J. 2004) (noting that "[t]he information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703").

Simply put, Dr. Parrish's opinions on whether the Centurion Defendants violated the standard of care are not based on sufficient data or sound methodology. Instead, they are based on medical records cherry picked by Mr. Diaz's counsel. When expert opinions are not based on sufficient data, they should be excluded as unreliable. *See Carmody v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-CV-830-ORL-37, 2015 WL 5542534, *3 (M.D. Fla. Sept. 18, 2015) (excluding testimony on causation where doctor only examined the plaintiff once, did not review the plaintiff's prior medical reports or history, did not communicate with the plaintiff's prior doctors before forming causation opinion, and was unaware about prior injuries the plaintiff sustained in accidents); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 756 (3d Cir. 1994) (upholding exclusion of expert testimony on causation where the physician "did not even look at medical records of the plaintiffs much less examine them," and failed to consider alternative causes).

That is precisely the case here. Dr. Parrish did not review all the medical records that *he testified he needed to review* to render a reliable opinion. Ex. C at 107:1–13. Accordingly, the Court should exclude his opinions.

## 2.   Dr. Parrish's opinions are premised on faulty assumptions about FDC policies.

In addition to Dr. Parrish's opinions being based on incomplete and insufficient data, Dr. Parrish's opinions are also unreliable because they are based on inaccurate assumptions, rendering his opinions nothing more than *ipse dixit*. *Joiner*, 522 U.S. at 146.

Dr. Parrish testified that he was unfamiliar with FDC's policies and procedures. This included Dr. Parrish not knowing who was responsible under FDC's policies for performing the ocular irrigation of Mr. Diaz after the use-of-force incident, and Dr. Parrish not understanding how the FDC sick call procedures work.

11

For instance, Dr. Parrish testified he did not know the following information that was a predicate to his opinions:

•       Dr. Parrish did not know what FDC's policies and procedures were for treatment after use of chemical agents. Ex. C at 150:1–4.

•       Dr. Parrish did not know how patients were referred to specialists. *Id.* at 105:5–8, and 125:5–11.

•       Dr. Parrish did not know who was responsible for water decontamination following use of chemical agents. *Id.* at 107:14–25 to 108:1–4 ("As I've spoken earlier, in my opinion, without knowing who's responsible for what within the context of FDOC, this is an institutional failure….") and 109:3–16 ("In my use of the "Defendant" it is really the institution failure -- not being but identify who's responsible in providing that care -- but, in a sense, if it's a -- it's a shared responsibility throughout the institution or the enterprise for failure to provide the proper irrigation. **Who specifically is responsible for that would be defined by the protocol in the FDOC.**").

•       Dr. Parrish did not know what equipment was available at FDC for water decontamination, including in the medical room where Nurse Moise evaluated Mr. Diaz, and had not requested the information. *Id.* at 121:5 –11, and 129:25 to 130:1–8.

•       Dr. Parrish did not know how sick call procedures worked, including how sick calls were submitted or what the stamps on the sick call requests forms indicated. *Id.* at 132:23–25 to 134:1–4; 136:9–12; 136:19 –25 to 1 –15; 138:3–25 to 139:1–15 (stating his opinion regarding when Nurse Mercedes received a sick call request was based on a stamp on the sick call request form and admitting, "I don't know what the meaning of the stamp is."); 142:5–7 (admitting he does not know what sick call requests and the stamps on them indicate). Instead, Dr. Parrish based his opinions about how sick call requests work on incorrect information he received from Mr. Diaz's

counsel. *Id.* at 137:18–21 ("This information was provided by Counsel, who's more familiar with the internal workings of the prison, and that information I have no reason to believe is other than factual."). After much back and forth, Dr. Parrish was forced to admit:

> Q: So as you're sitting here today, you don't know whether Nurse Mercedes saw Mr. Diaz on May 27th, 2020. Correct?
>
> A: That is correct, I cannot provide any other information than the testimony of the patient.

*Id.* at 145:8–12.

These assumptions by Dr. Parrish, are demonstrably inaccurate. First, Dr. Parrish's assumptions about sick call procedures and how patients are seen by clinicians was refuted by the Nurse Defendants' testimony and—not coincidentally—by the medical records Dr. Parrish was not provided. ECF Nos. 154-1 at 14:11–25 to15:1 (Nurse Moise testifying about sick call procedures); 154-2 at 16:19 –25 to 18:1–17 and 20:16 –25 to 21:1–7 (Nurse Mercedes testifying about sick call procedures); and 154-3 at 19:19 –25 to 20:1–6, 21:7–25 to 23:1, and 24:18–25 to 25:1 –25 to 28:1–25 (Nurse Moonsammy testifying about sick call procedures). Their deposition testimony demonstrates Dr. Parrish's assumptions about sick call procedures—how sick call requests were submitted, who received them, and who triaged them—were inaccurate.

As an example, consider Dr. Parrish's opinion that Nurse Mercedes violated the standard of care when she did not provide treatment to Mr. Diaz on May 27, 2020. Ex. B at 10, ¶¶ 13–14. The sick call request indicates Nurse Mercedes did not see Mr. Diaz until June 4, 2020. Ex. A at 5. Medical records not provided to Dr. Parrish show Nurse Mercedes saw Mr. Diaz on June 4, 2020—not on May 27. *Id.* at 6–8. Nurse Mercedes testified that she did not even begin working in sick call at Dade C.I. until June 2020, so she could not have seen Mr. Diaz on May 27, 2020. ECF No. 154-2 at 31:9–18, 36:18–23. It is clear that Dr. Parrish *assumed*—inaccurately—that Nurse

Mercedes saw Mr. Diaz on May 27, 2020, based on his misunderstanding of FDC's sick call procedures as relayed to him by Mr. Diaz's counsel.

Second, Dr. Parrish made incorrect assumptions about who was responsible for ensuring Mr. Diaz received water decontamination after he was pepper sprayed. Dr. Parrish opined that Nurse Moise's actions fell below the standard of care because she did not provide "at a minimum, immediate additional ocular irrigation." Ex. B at 9 ¶ 5. He later admitted at his deposition that he did not know if Nurse Moise was actually responsible for providing ocular irrigation. Ex C at 129:19–24. Nurse Moise, on the other hand, testified that it was the responsibility of corrections officers to provide ocular irrigation. ECF No. 154-1 at 33:7–16. And this testimony comports with Florida Administrative Code 33-602.210(9)1.–3., which explains corrections officers should provide water decontamination and contact medical staff only in certain situations. *See* ECF No. 154 at 9 –11 (discussing § 33-602.210(9)). So Dr. Parrish's assumption that Nurse Moise and the other Nurse Defendants were responsible for providing ocular irrigation is demonstrably false.

Based on the above, it is apparent that Dr. Parrish's opinions rest on inaccurate assumptions for which Dr. Parrish was unable to provide support. And without those assumptions, Dr. Parrish has no basis on which to opine that the Nurse Defendants violated the standard of care. Instead, Dr. Parrish's opinions are that he believes there was an institutional failure to provide treatment to Mr. Diaz, as he testified. *Id.* at 109:3–9. Indeed, it is fair to sum up Dr. Parrish's opinions as follows: "My opinion is that **someone** should have done more for Mr. Diaz." *Id.* at 129:18–19.

That someone should have done more for Mr. Diaz is an insufficient basis on which to opine the Nurse Defendants violated the standard of care, rendering his opinions unreliable. *Buland v. NCL (Bahamas) Ltd*, 992 F.3d 1143, 1151 (11th Cir. 2021) ("The unsupported assumption made

his testimony unreliable."); *accord McDowell*, 392 F.3d at 1298 (explaining expert opinion must be based on "something more than subjective belief or unsupported assumptions" to be reliable).

The conclusion is clear: Dr. Parrish's opinion rests on a plainly incomplete set of records and inaccurate understanding of the responsibilities of the various individuals who Mr. Diaz encountered at Dade C.I. Thus, Dr. Parrish's opinions, premised on demonstrably inaccurate assumptions, are unreliable and should be excluded.

## B.  Dr. Parrish's opinions are not helpful to the jury.

Dr. Parrish's opinions and testimony will not assist the trier of fact and, therefore, should be excluded. "[I]f the witness simply recounts the facts and then offers an opinion as to the conclusion which the jury should reach, such expert testimony is not permitted." *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006); *accord United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.). "[W]here an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong." *Giraldo v. City of Hollywood Fla.*, 142 F. Supp. 3d 1292, 1303 (S.D. Fla. 2015).

While expert opinions may embrace an ultimate issue, "courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding applicable law." *Feldman v. Target Corp.*, No. 3:19-CV-419-MMH-PDB, 2021 WL 1172794, at *2 (M.D. Fla. Mar. 29, 2021) (quoting *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)). So courts should exclude "expert testimony that employs terminology with legal import." *Id.*

Courts in this Circuit have repeatedly excluded expert testimony that a defendant acted with "deliberate indifference." *Omar*, 177 F. App'x at 63 n.5 (affirming an order "striking portions

of an affidavit provided by plaintiff's expert" because "the stricken statements contain legal conclusions as to whether the appellants acted with deliberate indifference."); *Goebert v. Lee Cty.*, No. 2:04CV505FTM29DNF, 2008 WL 1990462, at *3 (M.D. Fla. May 5, 2008) ("The Court, in the exercise of its discretion, will preclude the expert opinion that the conduct constituted deliberate indifference."); *Race v. Bradford Cty., Fla.*, No. 3:18-CV-153-J-39PDB, 2020 WL 8222416, at *3 (M.D. Fla. Dec. 15, 2020) (excluding certain expert opinions because they "contain legal conclusions when making determinations regarding deliberate indifference that are reserved for the jury"); *Salvani v. Corizon Health, Inc.*, No. 17-24567-CIV, 2019 WL 4101794, at *3 (S.D. Fla. Aug. 29, 2019) (same); *R.K. v. Kanaskie*, No. 02-61534, 2007 WL 2026388, at *5 (S.D. Fla. July 9, 2007) (same); *Alexander v. Loar*, No. 16-14422, 2017 WL 4324817, at *4 (S.D. Fla. June 7, 2017) (concluding expert opinion that practice showed deliberate indifference was inadmissible and did not create genuine issue of fact for summary judgment).

Dr. Parrish's report contains impermissible legal conclusions, clearly meant to evoke the Eighth Amendment's deliberate indifference standard, that will not assist the trier of fact. For example, Dr. Parrish opined that Nurse Moise's care amounted to "an inhumane and cruel indifference to Mr. Diaz's serious medical needs." Ex. B at 4, ¶ 5. He opined the same about Nurse Mercedes. *Id.* at 10, ¶ 14. During his deposition, Dr. Parrish explained his use of the term indifference and variations thereof had no medical significance and was suggested to him by Mr. Diaz's counsel. Ex. C at 42:12–25 to 43:1–18; 44:6–25 to 45:1–5; 69:24–25 to 70:1–14; and 116:5–25 to 117:1–9.

Mr. Diaz's counsel cannot use Dr. Parrish as a mouthpiece for their legal arguments by suggesting terms that have legal import—and which have no medical significance. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 765019, at *40 (N.D. Fla.

Feb. 28, 2021) (addressing "attorney mouthpiece" objections to expert opinions). As explained above, expert testimony is not helpful "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005). And a witness "may not testify to the legal implications of conduct." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

Mr. Diaz's counsels' suggestion that Dr. Parrish use variations of the term "deliberate indifference" in his opinions is a calculated attempt to insert Mr. Diaz's legal argument into Dr. Parrish's opinions. This is improper, and those portions of Dr. Parrish's opinions should be excluded as it will tend to confuse—rather than assist—the jury.

## CONCLUSION

Dr. Parrish's opinions should be excluded. They are not the result of a reliable methodology because Mr. Diaz purposefully withheld relevant medical records from Dr. Parrish—records Dr. Parrish testified he would need to review to provide a reliable standard of care opinion. Dr. Parrish's opinions are also based on unsupported assumptions, without which he has no basis to assign fault in the treatment provided by the Nurse Defendants. And, lastly, Dr. Parrish's opinions invade the province of the jury by including legal conclusions masquerading as medical opinions at the suggestion of Mr. Diaz's counsel. As such, the Court should conclude Dr. Parrish's opinions are unreliable and unhelpful to the jury and, accordingly, exclude them.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I certify that I conferred with Plaintiff's counsel in writing on March 2, 2022 and March 3, 2022, and Plaintiff opposes the relief sought herein.

Respectfully submitted:

s/ Brian A. Wahl
Brian A. Wahl (FBN 95777)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place-1819 5th Avenue, N.
Birmingham, AL  35203
Telephone: (205) 521-8000 | Fax: (205) 521-8800
Primary Email:    bwahl@bradley.com
Secondary Email:  tramsay@bradley.com

Jacob Hanson (FBN 91453)
BRADLEY ARANT BOULT CUMMINGS LLP
100 North Tampa Street, Suite 2200
Tampa, FL  33602
Telephone: (813) 559-5500 | Fax: (813) 229-5946
Primary Email:    jhanson@bradley.com
Secondary Email: tabennett@bradley.com
Secondary Email: tbush@bradley.com
Secondary Email: sdhayes@bradley.com

Erin D. Saltaformaggio (MS Bar No. 103999)
***Admitted Pro Hac Vice***
BRADLEY ARANT BOULT CUMMINGS LL
One Jackson Place
188 East Capitol Street, Suite 1000
Post Office Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Fax: (601) 948-3000
Primary Email: esaltaformaggio@bradley.com

***Counsel for Defendants, Tarama Moise,***
***Samantha Moonsammy and Kimberley Mercedes***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to counsel of record.

/s/ Brian A. Wahl
Brian A. Wahl
***Counsel for Defendants, Tarama Moise,***
***Samantha Moonsammy and Kimberley***
***Mercedes***